**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**IRVIN GEORGE,**

            **Plaintiff,**

**-vs-**                                              **Case No. 6:04-cv-1356-Orl-22DAB**

**ORANGE COUNTY CORRECTIONS**
**DEPARTMENT,**

            **Defendant.**
_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

This cause came on for consideration without oral argument on the following motion filed herein:

> **MOTION:**    **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 40)**
>
> **FILED:**      **August 3, 2006**
> _____
>
> **THEREON** it is **RECOMMENDED** that the motion be **GRANTED**.

### *BACKGROUND*

Plaintiff filed an employment discrimination suit against Orange County, Florida[1] (herein "the County"), asserting racial discrimination in violation of Title VII of the Civil Rights Act of 1964 and the Florida Civil Rights Act (Doc. No. 1). Plaintiff, who is Black, asserts that "[o]n or about

---

[1] Although the Complaint names "Orange County Corrections Department" as Defendant, the County points out (without contradiction), that the Corrections Department is not a separate governmental entity, but is a unit of the government of Orange County. As such, the County itself is the proper defendant (Doc. No. 9).

November 5, 2003, [he] was suspended with pay for over ten months by Orange County Corrections Department because of unproven allegations of credit card fraud." (Doc. No. 1, ¶ 21). The County answered (Doc. No. 9), denying the allegations of racial discrimination, and asserting various affirmative defenses, including the defense that all employment-related decisions with respect to Plaintiff were made "in good faith for legitimate, nondiscriminatory reasons." (Doc. No. 9, Seventh Defense). Defendant has moved for summary judgment, and has filed deposition excerpts in support of the motion (Doc. No. 40, Attachments 1-10), as well as Affidavits of County Personnel (Doc. No. 41, Attachments 1-5). Plaintiff has filed a Response brief (Doc. No. 44), which references "attached exhibits," but does not, in fact, include any such exhibits.[2] Defendant, with leave from the Court, has filed a three page Reply, with attached Deposition excerpt (Doc. No. 47).

On November 16, 2007, the District Court referred the motion to the undersigned United States Magistrate Judge (Doc. No. 53). The Court has considered the briefing, the evidence of record and the applicable law. It is **respectfully recommended** that Defendant's motion for summary judgment be **GRANTED.**

## *STATEMENT OF FACTS*

Although the parties draw different inferences from the factual scenario, and some of the minor factual details are not crystal clear, the Court finds that the *material* facts are not in dispute. The

---

[2]The Court issued an Order to Show Cause why sanctions should not be imposed for Plaintiff's failure to file the referenced exhibits. In response, Plaintiff electronically filed a Response indicating that he did not know that the exhibits were not attached, but still did *not* file the exhibits. Rather, Plaintiff mailed a copy of exhibits to the Clerk. This is not in compliance with the Court's Administrative Procedures for Electronic Filing in Civil and Criminal cases, which requires documents to be filed electronically. Since filing his Response to the Order to Show Cause, Plaintiff has re-filed his response brief; this time, attaching the missing exhibits (Doc. No. 56). In order to evaluate the motion on the most complete record, the Court will overlook the tardiness, and consider the exhibits, to the extent appropriate.

Court takes the following facts from Defendant's Statement of Undisputed Material Facts, to the extent they are not contradicted by Plaintiff in his brief.[3]

In 1988, Plaintiff was hired by the County as a Corrections Officer (herein "CO") in the County's Corrections Department, and has served in this capacity throughout his tenure with the County. (Plaintiff's March 23, 2006 Deposition, attached to Doc. No. 40; p. 59).  Plaintiff knew that he was required to adhere to the Orange County personnel policy, including the code of conduct, and was required to cooperate with respect to any job-related inquiry or investigation, or be subject to termination. *Id.* at pp.66-68.  Plaintiff knew that all employees were expected to report immediately to their supervisor, any and all suspected violations of the policies or any county regulation, and failure to do so might subject the employee to disciplinary action. *Id.*  Additionally, throughout his employment with the County, Plaintiff knew that he was required to comply with the Corrections Department's Administrative Orders, including Administrative Order AM 200, Rule 2.5, which states:

> Correctional Officers learning of conduct or observing conduct that is in violation of any law [or] policy of this department shall take necessary action and report the incident to the officer's immediate supervisor.  The officer shall report the incident to the immediate supervisor's supervisor.  This directive includes reporting illegal, or suspected illegal conduct by other Corrections employees, inmates, or other persons working in the facility.

*Id.* at pp. 71-72.

Timothy Ryan, the County's Chief of Corrections, and Captain Nancy DeFerrari have averred that, in practice, the Correction's Department has allowed officers to report such information to any supervisor, not just the officer's immediate supervisor.  Additionally, the Corrections Department has interpreted this policy as requiring officers to report such illegal, or suspected illegal conduct, within

---

[3]Plaintiff has not offered a statement of undisputed material facts and his argument is based, in part, on evidence that he has not placed before the Court.

a reasonable period of time under the circumstances. The Corrections Department has only required oral reporting under the policy; officers are not required to report in writing. (Ryan Affidavit, ¶4; DeFerrari Affidavit, ¶4.)

In June 2003, Plaintiff had a conversation with Orange County Jail inmate Marcus Evans, in which Inmate Evans told Plaintiff that he had a "gang of officers" at the Corrections Department's Jail facility that was dealing in stolen credit cards (Plaintiff's Deposition, pp. 84-86). Inmate Evans identified these officers as CO Sean Johnson, CO Randolph, CO Roper, CO Allen, CO Green, CO Morris, and CO Manuel. *Id*. at p. 109. Each of these officers is Black. *Id.* Plaintiff testified in deposition that Inmate Evans told him that bills were being paid off for these officers and cars and rims were being purchased with the stolen credit cards. *Id.* at 86.

It is undisputed that Plaintiff did not report the conversation to any supervisor at that time. Rather, Plaintiff talked to CO's Johnson, Randolph, Roper and Allen and "told them that I had heard some bad information about them, their names was ringing in the main jail." *Id.* at 90. Plaintiff did not report the conversation until October 15, 2003, when he reported the incident to Lt. Adams. *Id.* at 89. According to his deposition testimony, Plaintiff did not report the information sooner because he felt that it was just "rumors." Lt. Adams, who was not Plaintiff's immediate supervisor at the time, was the first and only Corrections Department supervisor to whom he reported the information.

Lt. Adams promptly reported her conversation with Plaintiff to Lt. Melanie Monroe, supervisor of the Internal Affairs unit, and Lt. Monroe passed the information up her chain-of-command. (Adams Depo., p. 41, Monroe Affidavit, ¶3; Ryan Affidavit, ¶11.) [4]

---

[4] The record indicates that Lt. Adams reported the conversation to her supervisor the same day Plaintiff reported it to her. It appears that she initially thought the conversation with Plaintiff occurred in December 2003, but Lt. Adams testified in her deposition that she was mistaken. [Adams Depo. at p. 46]. Cell phone and other records established that the initial conversation with Plaintiff occurred on October 15, 2003, as acknowledged by Plaintiff in his deposition.

-4-

For a period of up to three years prior to October 2003, the FBI and local law enforcement agencies were conducting investigations into possible drug smuggling, credit-card fraud and identity theft by corrections officers at the Jail (Ryan Affidavit at 5). Plaintiff was interviewed by the FBI on October 23 and 24, 2003, and told the FBI about the information that was provided to him by Inmate Evans, including the identity of Inmate Evans' purported gang of officers. The FBI report also notes that Plaintiff had conversations with some of the "gang of officers" about Inmate Evans' allegations against them. (Plaintiff's Deposition Exhibit 9.) The FBI, in turn, verbally briefed Chief Timothy Ryan and, in late October/early November, Chief Ryan and other County officials reviewed the information presented by these law enforcement agencies, and, as to each individual named, charted what information had been presented about each in an effort to determine whether there was cause to believe that they may have engaged in misconduct in connection with possible criminal activity within the Orange County Jail. Although Plaintiff disputes that there was cause to believe that he was engaged in misconduct, it is undisputed that Chief Ryan determined that cause existed to believe that the following officers may have been engaged in misconduct: CO Johnson, CO Randolph, CO Roper, CO Allen, CO Isidro Iglesias (Hispanic), CO Rick Brandenberger (White), and Plaintiff. With respect to Plaintiff, Chief Ryan has averred that he was persuaded by the information provided by the FBI that Plaintiff had received first-hand information from Inmate Evans regarding criminal activity by Inmate Evans and his "gang of officers," and, instead of immediately reporting the information to a supervisor, Plaintiff went to a number of the "gang of officers" possibly to tip them off. According to Chief Ryan, this gave him reason to believe that Plaintiff was possibly involved in the purported credit card scheme with the "gang of officers." (Ryan Affidavit, ¶6.)

On November 5, 2003, Chief Ryan placed Plaintiff on paid administrative leave pending a County administrative investigation into the information provided by the FBI. CO Johnson, CO Randolph, CO Roper, CO Allen, CO Iglesias, and CO Brandenberger were also placed on paid administrative leave pending the County's administrative investigation. While Plaintiff contends that he was placed on administrative leave as a result of racial discrimination, Chief Ryan has averred that these officers were placed on leave as he believed that it would pose a security risk for these officers to continue to perform their duties during the County's investigation. Chief Ryan has averred, without contradiction, that he was not aware of Plaintiff's race at the time that he decided to place him along with the other officers on paid administrative leave. (P. Depo., p.121, and deposition Ex.10; Ryan Affidavit, ¶9.)

Chief Ryan told his supervisor, Director of Public Safety Jerry Demings of his decision to place Plaintiff and the other officers on leave with pay, pending a County administrative investigation. Director Demings has averred in Affidavit that he concurred with Chief Ryan's decision that there was cause to believe that these officers may have engaged in misconduct and that it would pose a security risk for these officers to continue to perform their duties during the investigation. Director Demings attests that Chief Ryan's actions were not racially motivated and that he would not have allowed Chief Ryan to go forward if he believed that they were. (Demings Affidavit, ¶4.)

The County's Office of Professional Standards (hereafter "OPS") was assigned the responsibility for conducting the County's administrative investigation into the information provided by the law enforcement agencies. On January 13, 2004, Plaintiff was interviewed by OPS Investigator Kevin Gibson. During this interview, Plaintiff placed his conversations with Lt. Adams "about three weeks prior to all this coming out," consistent with the October 2003 time frame (P. Depo., pp.127,

139, Ex.11). In February 2004, Lt. Adams was interviewed by Lt. Monroe. Lt. Adams' testimony differed from Plaintiff's testimony. (Adams Depo., pp.43, 46; Monroe Affidavit, ¶6). Investigator Gibson and Lt. Monroe again interviewed Plaintiff on March 10, 2004.  During this interview, Plaintiff was provided an opportunity to review Lt. Adams' statement. When asked regarding the discrepancies, Plaintiff stated: "I'm on a lot of medication right now. I don't remember a lot of that stuff. Probably don't need to be here for this interview, the medicine that I'm on." The interview was then terminated, and Lt. Monroe directed Plaintiff to bring in a doctor's note confirming that he was taking medications that affected his ability to participate in the interview. (P. Depo., pp.142-147; Ex. 30, p. 9).

On March 12, 2004, Lt. Monroe contacted Plaintiff and instructed him to send her the information from his doctor, via facsimile, by March 14, 2004.  Plaintiff was told that if he did not do so, Lt. Monroe would pursue charges against him for interfering with an investigation.  Plaintiff did not submit the medical documentation as directed by Lt. Monroe, nor did he inform Lt. Monroe that his doctor would not provide the requested information (P. Depo., pp. 153, 155-156, 158; Plaintiff's Deposition taken on April 27, 2006, p. 17; Monroe Affidavit, ¶8).

On April 7, 2004, Plaintiff was interviewed again. During this interview, he told Investigator Gibson and Lt. Monroe that his conversation with Lt. Adams, in which he reported his conversation with Inmate Evans, occurred in the summer 2003 (P. Depo., pp. 171, 172, Ex. 14).  Plaintiff contends that this was a mistake.

Around this time, the FBI provided the Corrections Department with a written report of their October 2003 interview with Plaintiff, which stated in pertinent part:

> Regarding the mater of the credit card scheme in the OCCD, GEORGE stated, OCCD inmate Marcus Evans told him and another OCCD CO Burgess that

-7-

> several COs were involved in his credit card scheme. GEORGE advised he was made aware of inmate EVANS' credit card scheme in June of 2003 and reported the information to OCCD Lieutenant Adams approximately one week ago (October 16, 2003).
> \*\*\*
> GEORGE stated, CO Johnson told him, inmate Evans paid off a credit card bill for him using a stolen credit card, and CO Randolph informed him that inmate EVANS approached him about getting involved in the credit card scheme.

(P. Depo., Ex.9; Monroe Affidavit, ¶9; Ryan Affidavit, ¶10).

According to Chief Ryan, this written report of the FBI interview included allegations raised by Plaintiff against a number of officers, such as CO Pipkins, CO Kennis Morris, and CO Tonya Green, that were not disclosed during the FBI's verbal briefing in October 2003, and had not been previously brought to the County's attention. Chief Ryan attests that, as he was not aware of these allegations in November 2003, these officers were not placed on leave with pay in November 2003. As the County's administrative investigation was ongoing, the County decided to address these new allegations as part of the administrative investigation. The County's administrative investigation did not substantiate these other allegations. While the investigation did disclose that CO Lynette Burgess (Black), who is named in written report of George's FBI interview, also failed to report the conversation with Inmate Evans, CO Burgess left the County's employ prior to the County's investigation being completed, and, therefore, CO Burgess was not disciplined in connection with this matter. (P. Depo., p. 85; Ryan Affidavit at 10.)

On May 6, 2004, OPS issued an Investigative Report finding that Plaintiff violated Department Administrative Order 200, Rule 2.5 by not timely reporting the conversation. Additionally, OPS concluded that Plaintiff violated the County's Code of Conduct by interfering with the OPS investigation in that he, among other things, failed to provide Lt. Monroe with a doctor's note as

instructed verifying that he was taking medication on March 10, 2004, that would have interfered with his ability to testify during his interview. (P. Depo., p.174; Ex.16).

On July 13, 2004, Captain DeFerrari conducted a Pre-Determination Hearing for Plaintiff. During this hearing, Plaintiff insisted that he reported the conversation that he had with Inmate Evans to Lt. Adams in June/July 2003. (P. Depo., pp.172, 185, 188, 190; Ex.17). Captain DeFerrari had OPS reopen the investigation to determine if there was any proof of when the conversation occurred. As part of this supplemental investigation, Lt. Adams procured a copy of her cell phone records. These records, along with Department work logs, established that Plaintiff first reported his conversation with Inmate Evans to Lt. Adams on October 15, 2003. These records also established that Lt. Adams reported the information to Lt. Monroe that same day, which was verified in a September 21, 2004 sworn statement from Lt. Adams. OPS issued a Supplemental Report detailing this information on September 28, 2004. (P. Depo., pp.192-94, 197-98, 211; Ex.19-20; DeFerrari Affidavit, ¶7). Plaintiff does not dispute that the conversation did, indeed, occur on October 15, 2003.

On January 1, 2005, after a second Pre-Determination Hearing, Captain DeFerrari issued a Pre-Determination Hearing Results letter terminating Plaintiff's employment with the County, effective that date, sustaining the violations set forth in the OPS Investigative Reports regarding not timely reporting the conversation with Inmate Evans and interfering with an investigation by not providing the doctor's verification (P. Depo., p. 200; Ex.21; DeFerrari Affidavit, ¶8). Thereafter, Plaintiff filed a grievance regarding his termination pursuant to the collective bargaining agreement between the corrections officers' union and the County. During Step I of the grievance process, Plaintiff provided information from his doctor, and explained, for the first time, that he had been having trouble getting the requested information from his doctor. The County disputes this, and

contends that the documents produced do not establish that Plaintiff was unable to cooperate with the investigation. Regardless, the material fact is undisputed: Plaintiff provided information from his doctor at that time. (P. Depo., pp.153, 156,158, 212-213; Ex.13 (3/11/04 entry); Ex.14). At Step II of the grievance process, Chief Ryan offered to reinstate Plaintiff if he would accept a 60-day suspension without pay and certain conditions. Plaintiff rejected the offer and advanced his Grievance to Step III – a hearing before a Grievance Adjustment Board (hereafter, "GAB") (P. Depo., pp. 212-13; Ex.24).

On July 1, 2005, a GAB hearing was conducted on Plaintiff's grievance. The GAB was composed of the chair, Director Demings (Black), members Union President Jerome Fowler (Black) and Corrections Major Richard Anderson (White). After hearing, the GAB unanimously concluded that Plaintiff had violated the County/Department policies as determined by Captain DeFerrari. However, the GAB unanimously voted to reduce Plaintiff's discipline from a termination to a 30-day unpaid suspension, with conditions, based on Plaintiff's 17-plus years of competent service with the County and his record of limited prior discipline. Plaintiff returned to work in July 2005 and has since satisfied all conditions imposed by the GAB (P. Depo., pp. 213, 214-215, 217-218, Ex. 25; Demings Affidavit, ¶5).

### *SUMMARY JUDGMENT STANDARD*

A court shall grant summary judgment when the evidence before it shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Rule 56 mandates the entry of summary judgment, upon motion, against

a party who fails to make a showing sufficient to establish an element essential to his case on which he bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 252 2552, 91 L.Ed.2d 265 (1986). "In making this determination, the court must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir.1995). The moving party carries the initial burden of showing that there is an absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The substantive law governing the case determines which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In evaluating a motion for summary judgment, the Court's role is not to weigh the evidence or to assess credibility, but to determine whether there is a genuine issue for trial. *Posada v. James Cello, Inc.,* 135 Fed. Appx. 250, 251-252 (11th Cir. June 10, 2005) (not selected for publication) (internal citations omitted). "Sufficient" evidence is that which is more than "merely colorable" and is "significantly probative." *Id.* citing *Liberty Lobby*, 477 U.S. at 250-51.

### *ISSUES AND STANDARDS OF LAW*

Plaintiff maintains that he was treated less favorably than other correctional officers in violation of federal and state law.[5]

### *Title VII standards of law*

The parties agree that in order to establish a prima facie case of disparate disciplinary treatment under Title VII, Plaintiff must demonstrate the following: (1) that he belongs to a class

---

[5] The Florida Civil Rights Act is patterned closely after Title VII, and Court's have construed the state act consistent with the federal statute. Thus, this analysis applies to both claims. *See Harper v. Blockbuster Entertainment, Corp.*, 139 F.3d 1385, 1387 (11th Cir. 1998); *Joshua v. City of Gainesville*, 768 So.2d 432, 435 (Fla. 2000).

protected under Title VII; (2) he was qualified for the job; and (3) a similarly-situated employee engaged in the same misconduct that he engaged in, but was disciplined differently. *Austin v. City of Montgomery*, 2006 WL 2219726, *1 (11th Cir. August 2, 2006) (unpublished) *citing Lathem v. Dep't of Children and Youth Serv.*, 172 F.3d 786, 792 (11th Cir. 1999). As for the third requirement, "[t]he relevant inquiry is not whether the employees hold the same job titles, but whether the employer subjected them to different employment policies." *Lathem*, 172 F.3d. at 793.

When a plaintiff alleges discriminatory discipline, to determine whether employees are similarly situated, the Court must evaluate "whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999) (citations and quotation marks omitted). As the Eleventh Circuit has recently noted in a case involving the same Defendant as here: "When making that determination, '[w]e require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges'." *Burke-Fowler v. Orange County, Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006) (internal citation omitted).

A plaintiff's successful assertion of a prima facie case "creates a rebuttable presumption that the employer unlawfully discriminated against her." *E.E.O.C. v. Joe's Stone Crab, Inc.*, 296 F.3d 1265, 1272 (11th Cir. 2002) (internal citation omitted). The burden then shifts to the employer to produce evidence that its action was taken for a legitimate, non-discriminatory reason. *Joe's Stone Crab*, 296 F.3d at 1272. "Should the employer meet its burden of production, the presumption of discrimination is rebutted, and the inquiry 'proceeds to a new level of specificity,' in which the

plaintiff must show that the proffered reason really is a pretext for unlawful discrimination." *Id.* at 1272-73

### *ANALYSIS*

For present purposes, the parties agree that Plaintiff is a member of a protected class and was at all relevant times, qualified for the job. As set forth in the Complaint, Plaintiff contends that he suffered an adverse employment action in that "[o]n or about November 5, 2003, [he] was suspended with pay for over ten months by Orange County Corrections Department because of unproven allegations of credit card fraud." (Doc. No. 1, ¶ 21). From his response brief, it appears that Plaintiff is also asserting that his termination (later reduced to a suspension, with conditions) was also an adverse employment action. Regardless, Defendant contends that it is entitled to summary judgment in that Plaintiff cannot identify a similarly situated comparator who was treated more favorably. Moreover, Defendant argues that it has articulated a legitimate non-discriminatory reason for the adverse action, and Plaintiff cannot show pretext. The Court agrees with Defendant and **respectfully recommends** that the motion be **granted.**

### *Similarly Situated Comparator*

Plaintiff asserts that the County treated him differently than it treated CO Pipkins or Lt. Adams, both white employees. The undisputed material facts of record, however, establish that neither asserted comparator was similarly situated, as a matter of law.

**CO Pipkins--**Plaintiff cites to an Investigative Report dated April 28, 2004 regarding an FBI interview with CO Pipkins (Doc. No. 44 at p. 5). The Court notes that the exhibit is unaccompanied by any Affidavit or deposition excerpt attesting to its authenticity. Regardless, even if the Court were to give full credit to Plaintiff's interpretation of what this document contains, Plaintiff cannot establish

that CO Pipkins is a valid comparator.  According to Plaintiff, Pipkins was interviewed and asked questions "related to his possible knowledge of wrongdoing." *Id.*  Plaintiff argues that Pipkins was not suspended, even though:

   1. Mr. George and CO Pipkins are correctional officers with OCCD.
   2. Mr. George and CO Pipkins allegedly had knowledge of wrongdoing in the facility and were both interviewed by the FBI.
   3. Mr. George reported to the FBI that Pipkins was involved in wrongdoing.
   4. CO Pipkins reported to the FBI that George was involved in wrongdoing.
   5. The FBI interviewed Mr. George and CO Pipkins during their investigation.

*Id.* at p. 6.

Clearly, this is insufficient to establish that Pipkins conduct was "nearly identical" to Plaintiff's.  Plaintiff's premise, as articulated in his brief, is that "Mr. George's suspension allegedly was based on allegations against him which were provided by a written FBI report and those allegations warranted his suspension because of the 'direct impact on security of the institution.'" *Id.* To the extent the written FBI report Plaintiff is referring to is the Pipkins FBI report, there is no evidence that the County based its suspension of Plaintiff on that report, or even that the County had that report (or knowledge of the allegations allegedly made by Pipkins about Plaintiff) at the time Plaintiff was suspended.  Indeed, Plaintiff was suspended November 5, 2003, and Plaintiff represents that Pipkins was not interviewed by the FBI until months later; on April 28, 2004.  To the extent that the written report referred to is the FBI Report of the interview of Plaintiff himself, as set forth in the uncontroverted Affidavits and deposition excerpts submitted by Defendant, Plaintiff was suspended *before* the County had received the written FBI report.  Moreover, as Chief Ryan avers, based on the *oral* briefing presented by the FBI, "I was persuaded by the information provided by the FBI that George received first-hand information from Inmate Evans regarding criminal activity by Inmate Marcus Evans and his 'gang of officers,' and, instead of immediately reporting the information to a

-14-

supervisor, George went to a number of the 'gang of officers' possibly to tip them off." (Ryan Affidavit at p. 3). Thus, the suspension was not based on allegations of wrongdoing made by Pipkins or others; it was based on Plaintiff's *own admission* that he had received information from Evans, had not reported it, and had relayed the information to members of the alleged 'gang of officers.'

The misconduct Pipkins allegedly engaged in, as described by Plaintiff, is not nearly identical. Plaintiff asserts that Pipkins "was accused of soliciting the help of a Latin King Gang member to beat up his daughter's boyfriend" (Doc. No. 44 at 7). As set forth by Capt. DeFerrari, in her uncontroverted Affidavit:

> I was also responsible for reviewing the OPS investigation conducted on CO Herschel Pipkins and determining what, if any, disciplinary action should be taken against him. The OPS investigation of CO Pipkins revealed that CO Pipkins confided in an inmate that his daughter was having trouble with her boyfriend, which led the inmate to state that "his guys on the outside" would take care of things for CO Pipkins if he wanted. CO Pipkins shrugged off this statement and made no attempt to follow up with it. As a result, County OPS determined that CO Pipkins had violated the Department's fraternization policy; OPS did not find CO Pipkins in violation of Administrative Order AM 200, Rule 2.5.

(Doc. No. 41-2 at ¶10). Pipkins was disciplined for violation of the Administrative Order that prohibited fraternization and given an oral reprimand. As Capt. DeFerrari attests, the CO's situations were "entirely different" because the CO's violated different policies. Plaintiff had knowledge of an admission by an inmate of an active, ongoing criminal enterprise involving fellow officers at the jail, while Pipkins conversation involved, at worst, an offer (which may or may not have been sincere) to

have someone else commit an off-premises future crime.[6] Capt. DeFerrari also notes that, unlike Pipkins, Plaintiff was found to have interfered with an investigation. *Id.* at ¶ 11.

Plaintiff contends that Pipkins should have been charged with failure to report, but was treated more favorably and this charge was overlooked. As support for this contention, Plaintiff cites to another unauthenticated memorandum apparently written by "William Rivera, in Human Resources" stating:

> That said, it would serve Management well if Pipkins were to be sustained for failure to report. Note that if we give him a verbal reprimand for fraternization, that decision may work against Management in the future. If management decides to keep the fraternization charge, then you should consider a written reprimand. HR's opinion: sustain him on failure to report and issue a verbal. If you decide to keep the frat charge: written.

(Doc. No. 44 at 7).

Plaintiff argues that this "evidence" establishes that "many were aware" that Pipkins should have been charged with violating the failure to report policy. That is not the standard, however, for establishing disparate treatment. Absent any information as to the role (if any) Rivera played in determining discipline for *both* officers, this excerpt shows, at best, that *someone* in HR felt that CO Pipkins deserved a verbal reprimand for failing to report. As the decision makers were obviously not in agreement with this recommendation, this opinion is of no moment. It certainly does not serve to establish that Pipkins and Plaintiff committed nearly identical misconduct, but were punished differently due to race.

---

[6]The Court does not mean to imply that solicitation of a crime is not, in itself, a criminal wrongful act. In this case, however, there is no indication that Pipkins interpreted this "offer" as a criminal solicitation. By contrast, there can be no doubt that Plaintiff recognized the seriousness and criminal nature of the credit card fraud described by Evans.

The Court finds that no reasonable jury could find disparate disciplinary treatment based on this record. CO Pipkins was not similarly situated to Plaintiff.

**Lt. Adams--**Plaintiff next contends that he was treated dissimilarly to Lt. Adams. According to Plaintiff:

1. Lt. Adams is an employee of OCCD.
2. Mr. George was charged with violating rule 2.5 because he failed to report a rumor about criminal activity in a timely manner.
3. Mr. George did in fact report the rumor to Lt. Adams.
4. Lt. Adams did not report the information she received from Mr. George.

(Doc. No. 44 at 9).

This argument is without any support and is, in fact, contradicted by Plaintiff's own testimony and the remainder of the record. The record establishes, without contradiction, that Lt. Adams reported the information she received from Plaintiff *on the very day that she received it.* Plaintiff appears to be contending that the fact that Lt. Adams was initially "mistaken" about the date Plaintiff first spoke with her somehow converts her to a valid comparator. This is incorrect. The adverse employment action sued upon is Plaintiff's suspension in November 2003, based on his own report to the FBI that he conversed with Evans and then the gang of officers, raising concerns that he had "tipped them off" and might be involved.[7] Plaintiff was not suspended or otherwise disciplined because, in later proceedings, he was mistaken about the date he reported the Evans conversation. As established by the uncontroverted Affidavit of Nancy DeFerrari, Plaintiff was eventually disciplined because he failed to timely report the incident, and because he failed to cooperate in an investigation by not timely submitting the required doctors note. He was never disciplined for making

---

[7] Indeed, Lt. Adams was not interviewed regarding this matter until February 2004 (Affidavit of Melanie Monroe). Thus, Lt. Adams' mistake had no effect on the decision to suspend Plaintiff in 2003.

a mistake regarding the date he initially contacted Lt. Adams.  As such, the fact that Lt. Adams was also not disciplined for making the same mistake is irrelevant.

### *Pretext*

As Plaintiff has failed to establish the existence of a similarly situated comparator who was treated more favorably, the Court need not reach the issue of pretext.  "If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).  Assuming *arguendo* that the District Court were to disagree with this conclusion, and were to find that Plaintiff had established a *prima facie* case, summary judgment would still be appropriately granted in Defendant's favor, due to the absence of any evidence sufficient to infer pretext.

The County has articulated legitimate, non-discriminatory reasons for its actions, as set forth above.  Thus, the burden shifts to Plaintiff to come forward with evidence sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.  *Joe's Stone Crabs*.  Here, Plaintiff offers nothing more than the bald assertions that:

> 1. The failure to suspend CO Pipkins even though he also had allegations of wrongdoing against him and the failure to charge and disciple [sic] CO Pipkins for violating rule 2.5 would allow a reasonable fact finder to infer discriminatory animus in finding that the County's reasons for suspending and later terminating Mr. George were pretextual.
>
> 2. Not being able to remember that it was during the month of October (the same month the FBI conducted interviews) that Lt. Adams talked to her [sic] Melanie Monroe several times, about Mr. George, is highly suspect.

As discussed above, Plaintiff has not established that Pipkins was similarly situated.  As such, the County's treatment of a different violation under different circumstances does not serve as

evidence of pretext. Moreover, the "highly suspect" failure of Lt. Adams to remember the date of her conversation with Plaintiff has nothing to do with an inference of racial discrimination, as best this Court can tell. This showing is insufficient as a matter of law to present a jury issue on pretext.

It is undisputed that Plaintiff has admitted to the conduct for which he was eventually disciplined. While Plaintiff disagrees that his conduct warranted discipline, this is not an action to review the appropriateness *vel non* of the discipline. Plaintiff has alleged racial discrimination. There is not one iota of record evidence to support an inference that race was the actual reason for the discipline. In fact, Chief Ryan has declared, without contradiction, that he was not even aware of Plaintiff's race when he made the decision to suspend him. The motion should be granted.

### *CONCLUSION*

Plaintiff has failed to establish a genuine issue of material fact precluding the entry of summary judgment against him. It is **respectfully recommended** that the motion be **granted** and summary judgment be entered in Defendant's favor.

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Recommended in Orlando, Florida on December 11, 2006.

*David A. Baker*
DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record
Courtroom Deputy